May it please the court, counsel. My name is Scott Paulsen and I am the plaintiff and the appellant in this case. This case deals with the purchase of a home in Peoria, Illinois, located at 5930 Westridge Crest Circle. The facts begin in the spring of 2000 when the plaintiff, myself, began looking for a house in the Peoria area. A house was found at this location and a crack was noticed in the floor in the basement of the house. An offer was tendered but with a caveat saying that within 24 hours of the contract acceptance, the seller was to supply the buyer with, quote, all reports, opinions, and receipts regarding any previous lower level cracking and movement in and on walls, floors, etc., end quote. In response, two pages were provided. First, a letter dated March 27th, 1992 from the original builder of the house where the defendants penciled in or noted in there, quote, noting fixing of settling after the original construction, end quote. The second document provided in response to the caveat in the offer was a letter of transmittal. That letter of transmittal was from Whitney and Associates to Mr. David Maurer and again indicated that there was some testing done and again the defendants penciled in on that report, quote, distress was cracking along mortar lines in foundation walls. Cracks have subsequently been repaired via tuck pointing procedure. In neither of these documents is indicated by the defendants that there was a soil problem at the property. The other document that is relevant to this case as far as reassurances that were provided by that report provided to the plaintiff from the defendants indicated that the defendants were aware of mine subsidence, underground pits, settlement, or other stability defects. In that language on the report, they actually underlined the word settlement. They added this caveat, there was some cracking in the basement walls due to settlement of the soil, but all has been fixed, end quote. With those reassurances, the house was purchased in June or July of 2000. You don't know which? July of 2000, thank you. And in 2003, some cracking developed, but nothing significant. In 2006, some more significant cracking and some problems with doors was present in the house, which required further investigation. This part of Peoria is the Charter Oak subdivision, and it's kind of known for having the possibility of mines underneath that area. An investigation going through internet searches and referrals directed the plaintiff, myself, to a gentleman by the name of Phillip Smith with the Illinois Department of Natural Resources. Contacting Mr. Smith, he said, you know, I recognize that address. We did a report on that in 2000. Could you send me that report? Certainly, I could. That report was sent and delivered to me in July of 2006, where Mr. Smith indicated that he did a report in February of 2000, approximately four months before the closing, indicating that there was a problem with the soil at the property, indicating slope creep. Based on that discovery that, in fact, not all reports, opinions, and receipts were provided as part of the sales contract, a suit was filed in August of 2007. At the trial of the case in December of 2009, the plaintiff was asked, excuse me, the defendant was asked, were there any other reports that you did not submit as requested by that contract? And to his credit, the defendant said, yes, there was a report. And I asked that that report be produced, and it was. It was a 31-page structure report created by David Maurer. Of that 31-page report, one page was cherry-picked and was disclosed at the time of the purchase, the Whitney Letter of Transmittal. Also included in that 31-page report was another report by the W.G. Jock's Company of Iowa, indicating that there was a problem with the soil that required grouting and formation of the soil under the ground to support the structure. Based on the fact that that report was never disclosed, a subsequent amended complaint was filed during the trial on December 18th, 2009, and Judge Vespa allowed the amendment of that complaint to indicate that that report was never disclosed. The facts in this case show that there are clear and convincing evidence against the order in this court, and that the order and findings are against the manifest weight of the evidence. What statute of limitations do you say controls? There are two statute of limitations. There are two bases of action, basically, a negligence and a fraud. A negligent statute of limitations is two years. Statute of limitation on frauds is five. What? Okay. The statute of limitations on fraud is what? Five years. Okay. From when? From the discovery of the fraud, when you discover that you were defrauded. There is a discovery rule in here. So the question is when you knew or should have known that there was a fraud, okay? And what did the trial judge find of when you should have known? He didn't make a finding. That's one of the distinct problems with this case. The trial judge asked both parties to prepare an order, and so both parties did prepare an order, and he adopted the defendant's order. Those findings are inconsistent with what the evidence was and he didn't make a specific finding at all regarding when the fraud was discovered. All he did was adopted the paragraph in the order that said, the statute of limitations bars this action. But there's no finding whatsoever, no factual support, nothing in the order that tells us what the judge was thinking when he made that decision. The order is not based on the evidence that was produced, and it's not based on the appropriate law. That order also includes approximately five paragraphs where the defendants attempt to take safe harbor in the Residential Real Estate Property Disclosure Act, saying that if you rely on the advice of engineers, you have safe harbor from any disclosures you put in that report. But the elements of fraud are all present. The first one requires a concealment or a false statement of fact. The statement that all has been fixed is not mere puffery, it's a statement having to do with all has been fixed. The language that it was modifying was cracks and settlement. Defendants argue now that when we said all had been fixed, all we meant was cracks had been fixed, not settlement had been fixed. We were just modifying the word cracks. Also, they argue that all reports were not, or the argument is that all reports were not disclosed. The defendants say, well, that's a vague term, reports. We didn't know if you meant oral reports or written reports. Frankly, your honors, it doesn't matter. Neither of the reports were disclosed, oral reports or written reports. I have a, before we get to that point, just a question. Maurer's 31-page report, to what extent did he, if any, rely on Whitney and Associates? Is there anything in that report? Yes, there's soil boring logs, and Maurer is of the opinion, was of the opinion, is that the cause of the problems is mine subsidence. Whitney and Associates indicated that it was soil compaction. There's been no indication what the actual cause is. And that's- It somewhat goes along with Smith's analysis. Somewhat goes along with Smith's analysis. Mine subsidence hasn't been disproven. We don't know, and in fact, just for a visual representation, the Maurer report is on the council table spread out there. The one blue page is the one page that was cherry picked out. There's also a report from Philip Smith from the Department of Natural Resources. He prepared a written report that was approximately five pages long. The testimony isn't clear whether or not he provided that report to either party, although it's clear that he didn't provide it to me until July of 2006. The point was, is at the time of the closing, at the time these representations were made, defendants were aware of many, at least four experts, who had told them that there were varying problems with the soil and the ground surrounding the property. Maurer, the Whitney's, the Jock's report, and Philip Smith from the Illinois Department of Natural Resources. Of those, none of those- I wouldn't help me be aware of Smith, because you're saying it's records unclear as to whether Smith's report was received, or to whom that report may have been made. There was no discredit, there's no doubt that Smith and Mr. Grace, the seller, had at least a telephone conversation. Okay, that was, okay. And both parties were unclear as to whether or not he actually got a physical copy of the report. But he did admit that he had a telephone conversation with Smith in, I think it was November of 2009, regarding the findings of his report. So you're saying your provision at the time, where you say, supply buyer with all reports, opinions, and receipts, that opinions would actually cover oral, just oral? Oral and written, any opinion. It doesn't qualify, there's no qualification on those opinions being oral or written whatsoever. And the point of the matter was, none of them were provided either, anyway, be they oral or written. None of them were, so it really doesn't matter if you make that qualification or not. There's also a distinction to be made on the cause and the symptoms of the problem. The defendants argue that, look, we fixed the cracks, and we represented to you that we fixed the cracks. That is fixing a symptom of the problem, but not the problem itself. The problem itself is a problem with the soil that is causing the foundation to settle, which is causing cracks. Can I have a bit, just an opinion of one of these experts? I mean, in your brief at page 20, you said that Jack's company said they didn't know what it was. Mauer believes it's mine subsiding, Smith says it's not. So, I mean, how do they know what's wrong with it, and how does anybody know what's really wrong with this? That's the point, I think. Nobody knows what exactly is wrong with it, and many people have different opinions. None of those opinions were communicated to the purchaser of the house, and the only representation was that all had been fixed. Whatever the problems were, all had been fixed, and there's case law that supports that. The case from Chicago, I believe it's the Mitchell case, basically said, well, if you represent that all has been fixed, then all has been fixed, whatever those problems are. The defendants are saying, well, all only referred to cracking. We just fixed the cracking, and that's all we meant by all. But certainly the word all has more connotation than just one segment of the problem. Counselor, you have two minutes. Thank you. Let me just ask you, if I'm a homeowner, and I hire somebody, and it says I got a problem with my basement, I'm not an engineer. And they come in and say, this is what it took, and they say, here, we fix it for you. Here's the bill passed, and the homeowner thinks it's been fixed. Where's the fraud in saying, if the homeowner believes that it's been fixed, and telling you that it's been fixed? In not saying that that is all that was done. The requirement was to tell me that there was somebody who said that there was a problem that had been fixed. And to convey all reports consistent with that. And the jock report says that we can fix this through the grouting. That doesn't include tuck pointing. Tuck pointing won't be a fix. It'll just be something that you'll have to do after you fix the big problem. That is, with the foundation and settling of the house. Certainly, there are no cases provided by defendant to suggest that anything short of absolute and complete disclosure is required. All the cases say, any time you try and throw a rug over a problem or not disclose the entirety of what you know, you're subject to liability and you're fraud. Well, but where does the duty to disclose come from? One, the defendant submitted a duty to disclose in their answer. Well, but where did the duty arise from? I mean, it arises from what, the contract? From the contract and from the real estate disclosure law. Well, on the real estate disclosure law, that's a one year statute, isn't it? Yes, but the cases uphold that a fraud claim can be premised on the facts relating to a residential disclosure law violation and continue with a fraud action. In fact, the law says that the act itself does not remove or eliminate common law causes of action such as fraud. There is one other- Can I back up to the request you made, the additional request in the sales contract, where you asked them to supply all reports, opinions, and receipts regarding any previous low level, lower level cracking and movement in on the walls and the floors. Was there any request about any reports about ground shifting or moving? I mean, it appears here that you want to know about what was done about the cracking itself, which appears to me to be the result of a problem, but it appears that, did you fix the cracking? I mean, you know- Well, I don't think the request is limited to cracking. It says cracking and movement, and movement includes things that would cause the foundation to settle. And certainly, as I indicated, the case law suggests that you never limit yourself or any time that a defendant would limit themselves into, oh, we just have a little water problem. And it turns out you have a larger water problem. You're required to indicate the depth and extent of your water problem, not just the one limited example of a crack. Thank you, Mr. Paulson. Mr. Chambers. The honors. The honors, may it please the court and the counsel. I represent the appellees, Anthony and Marsha Grace. I know that you're thoroughly familiar with the briefs in this case, so I'm going to try to keep it brief and limited to, excuse me. What's been argued here today, we have a situation where my clients, the Graces, were aware of the cracking in their basement. And I think it's important to look at chronologically what they did when they were investigating what the issue was. They went to a structural engineer who gave them an opinion of what advice, if it was mine subsidence. After that then, they went to the soil engineers. Whitney thought maybe it was something other than mine subsidence. Soil compaction, soil creep, there's different terms that came out, we determined at the trial that could relate to similar things. But he wasn't sure, but he was aware of the gentleman who testified named Phillip Smith, who was a mine subsidence expert. I mean, that was what he, in the trial, that was what he did. He showed up, he was looking for mine subsidence. If it wasn't mine subsidence, then it kind of fell outside his realm. And he testified that it was not mine subsidence. At that point, we have three opinions. The two people who have the most experience in terms of dealing with the soil, and specifically mine subsidence, are saying this isn't mine subsidence. At that point, Maurer's report becomes irrelevant, because his report was dealing with, if it was mine subsidence. Then there was testimony through Mr. Grace, they went back to the structural engineer, Maurer, and said, all right, if it's not mine subsidence, then what do I need to do? And he testified, he was told, if it's not mine subsidence, then you tuck the point. And- I just have this question that why is Maurer's report irrelevant now? Because Maurer's report deals with if it was mine subsidence. Well, you know what? Mine subsidence is soil movement. Well, so really what we have here is soil movement. What the cause of the soil movement is may be disputed, but you've got the soil movement. Mine subsidence is soil movement. Hydrologic, compaction, those are soil movements. And I think a question is also then whether or not my clients reasonably were relying on their experts. Well, but Maurer was pretty specific in a 31-page report saying, these are the types of things you need to do to ensure the structure of your house is protected against soil movement. I happen to believe it's mine subsidence. Whitney believes it's soil compaction or some other. Smith says, no, I think it's not mine subsidence, but it's soil movement. Right, but the Graces were also told that once the cracking had stopped, if it stopped getting bigger, then it would be okay at that point to proceed with the tuck pointing. And where would we find that? It was in the testimony. Let me find that here in my brief, I cited it directly. It was testimony from Mr. Grace on the first day of the trial. Okay. Do you want me to find the exact page? No, Richard, we'll summarize it. You're saying Mr. Grace testified that he was told by whom? I believe that was by Mr. Whitney, I believe. But Mr. Whitney, that it won't get any worse? That in terms of fixing it, that once the cracking had stopped getting bigger. Once it stopped getting bigger. Right. But he didn't say when it would stop getting bigger. No, but Mr. Grace said that's when he had the tuck pointing done. When it looked like the cracking had stopped, that was when he proceeded with having the tuck pointing. And he was relying on, he was looking at it in terms of, you know, we've got a structural engineer who doesn't deal with soils. That's not his job. That's why Maurer, I guess you can infer, that's why Maurer said, let's go talk to somebody who does soils. Because they'll know more regarding this. Excuse me. At that point, I mean, they were just trying to reason. How often do you see a homeowner going through all of these steps just to make a determination of what the problem is? I think they went above and beyond. In addition to that, they did provide the information to the seller of who it was that had done the report. I think one other thing worth noting on the Maurer report is there was an objection to that being let in. And it was admitted in solely for the purpose of whether or not the Graces had knowledge of what was in it. The Maurer report itself was never admitted in for any substantive purpose at all. Also, the testimony that was, I would like to point out, I mean, you had asked a question regarding, you know, it came in through Mr. Grace. At that point, once that testimony came in through him without any objection, even though I think there could have been a hearsay objection made possibly, there was none made. So that came in for substantive purposes, not just in terms of his knowledge. Although this action was not brought under the Real Estate, Real Property Disclosure Act, it all started because of the Real Property Disclosure Act. Because of the requirements that any disclosures, any issues with the properties be disclosed to prospective buyers, that report be made. The appellant has argued that there's a provision in that that exonerates defendants if they are relying, reasonably relying, on the reports of contractors or experts regarding whether or not a property's been fixed. They've argued that because this isn't brought under that action, that that exonerating clause or that exonerating provision should not apply. And there isn't, I'll be honest, I have not seen any case law that says that it does. However, I think just a plain reading of that statute indicates that it should be considered, because it says that a seller's not liable for any error, inaccuracy, or omission of any information delivered pursuant to this act. If it was done based on a reasonable belief or reliance that it had been corrected, or that the problem had been addressed by either a licensed contractor, or an engineer relating to that field. I think the language of it, it doesn't say that this is a defense under any provision, under an action brought under this act. It says a seller is not liable for any error. I think that expands it out to a fraud action or a negligent misrepresentation action brought pursuant to that report having to be provided to buyers. Additionally, I think that's also intrinsic in the issues of just the basic elements of a fraud claim or negligent misrepresentation. Because in each instance, in one they have to show negligence in that they didn't reasonably rely on the reports, or fraud, that they had an intent to defraud. And I think both of those are incorporated in that. One last thing that I would want to address, the statute of limitations issue. I agree with counsel, statute of limitations time period is two years for the negligence, three years for the fraud. There was no ruling as to when he actually, when Mr. Paulson knew or should have known that there was a problem with the property. And I don't think there's any way we can determine, other than him saying, here's when I know. However, we look at the record, and there's statements of, well, I knew there was a slight problem in 2002. I knew there was a significant problem when he filed the action. But when we look at other evidence, it's obvious that he was aware of other problems prior to that. He contacted Phil Smith in 2002, regarding the issue of mine subsides, or regarding the issue of the cracker. He had people come and look at the properties, some of whom gave him quotes that were five figures. But he's saying, well, it didn't seem like it was that big of a deal. But he had a quote for over five figures to fix the problem. Most people would think, this is a big deal. And that was back in 2002. It's not just, I don't think it's just a matter of, from when he knew, I think there's also a question of, if there was a reasonable time left in the statute of limitations, when he did become aware, or should have become aware, that there was a problem, then he's still bound by that statute of limitations. I think, without question, in 2002, he should have been aware that there was some sort of an issue, if he was going to bring this action. And I think it also goes back even to the 2008, because he was given notice that there were cracking issues. He was given the names of people who had done reports. That coupled with them getting quotes of approximately $16,000, possibly to address cracking issues, I think it makes it so that the filing of this in 2007 was well beyond any statute of limitations period. And as I said, I was going to keep it brief. Hopefully I did do that, and I'm more than happy to answer any questions. Apparently no one has any questions. Thank you, Mr. Chambers. Mr. Paulson, some rebuttal. Thank you, Your Honor. First, the indication that I was given names of reports is an absolute falsehood. The only name that was given at the time of the closing was the Whitney report and the original letter from construction. Mr. Smith was not disclosed. The Jocks Company was not disclosed. The Illinois Department of Natural Resources was not disclosed. None of those were disclosed. The question of, well, we didn't have to give disclosure because we had a Maurer report and a Smith report. Therefore, that basically nulled each other out, and we didn't have the problem. That's not what the law says. The law says you are not free to decide what's relevant or not. The law of the court is to decide what's relevant or not. And there was a duty to disclose that was specifically admitted to in the pleadings. The reliance on experts in section 25A2 of the Residential Real Property Disclosure Act, the idea of reliance on experts will exonerate someone from liability is false. That defense is a safe harbor, but it does not exonerate you from fraud, from willful and wanton conduct. There was the mention that I got a quote for five figures when I had a cracking, noticed some cracking problems. Well, if that's so momentous, then the same thing applies to defendants who got a quote from the Jock Company on November 29th, 1999, approximately seven months before the closing, saying you have a five-figure problem. And how did they address that five-figure problem? With a $200 tuck pointing. And the cases say clearly that a fraud exists if you do not convey the whole truth, but only a partial truth. Or as the Rolando case says, when you use a band-aid approach to solve the problem. Tuck pointing is a band-aid approach to the soil movement problem that was present at the residence. But then, what did you do, but in 2002, you got a five-figure estimate. Sure did. And so, why did you not file suit until 2007? Because I didn't know I'd been defrauded. I didn't know I had been lied to. I didn't know that there were reports from experts out there, such as Phil Smith and Jock Company. Okay, why did it take you five years to figure that out? Because when there was just a cracking problem, I was in litigation, it was just a cracking problem. When it, that's just how it happens. Then I see there's a more significant problem, and the photographs indicate there's bulging in the walls in the upper part of the house. That's new. And I start talking to people, and they say, oh, that's Charter Oak, that's a mine problem. Do a Google search, find a Peoria Journalist article, find Phil Smith. There he is, contact him, and then the whole thing opens up. So it's when you are in contact with Phil Smith that you're aware that, from your argument and perspective, that they did not comply with that request. Correct. And that he had done it. And what date would that have been? Phil Smith was first contacted in 2003 when he did a report, but he didn't communicate that he had spoken to the defendants until July 2006. That's when he said, oh, by the way, there's another report out there. In fact, there's a- So you're basically saying that's your date then? I think so, yes. And a five year, counsel I think misspoke and said a three year statute of limitation for fraud, it's five years. And the complaint was filed in August of 2007 within that time period. There is a new case- But the fraud that you allege was committed in 2000, right? Correct. Was not discovered, though, until 2006, and the discovery rule applies to issues of fraud. And that would be the Smith incident, the Smith encounter? Yes, yes. And the discovery is not just when you subjectively knew, but it's an objective standard of when a reasonable person knew or should have known. I believe that's correct. I believe that's correct. There is a new case out there that was decided since the briefing of this case that I want to bring the court's attention to. It's- Counsel, you didn't like it? Well, if you want to give it to us now and if you would like to respond to it within seven days or if you want to just give us a sign of the new case, I don't have any problem with that. If you want to, I don't know if you're aware of it, Mr. Chambers, but if you want to file something within seven days, you can do that. What's the name of the case? NAPCOR, N-A-P-C-O-R, 938 North East 2nd, 1181. Basically, as I understand the argument from the defendant- No, they're- Well, if you're- They argue it, I think. Yeah, I think- I'm just citing that this is something going back. As I understand the argument of the defendants, basically, they're saying you should have figured out that we were not telling you the truth. You should have done reasonable investigation to figure out that there should have been a problem. And that's certainly not what the court holds in the Mitchell decision from the first district. Partial truths are insufficient, and there is no duty to go further than what the representations are made. I believe that this case should be sent back to the trial court for a finding on damages with an entry of order for the plaintiff. Thank you. Thank you, Mr. Paulson. Thank you both for your arguments here today. Again, Mr. Chambers, if you want to somehow have anything at all to say about, I don't think he's going to, you're not planning on our, let's clarify this so I know what's going to happen and we do. Do you plan on doing anything, Mr. Paulson, other than making us wear a nap core? That's it. Well, if you've got any new cases that have come out since the briefs were filed, since then we'll file something within seven days. No argument, just identify any cases that you think you can address, okay? All right, well, thank you for your arguments. We'll be in a brief recess.